**FORT MOJAVE INDIAN TRIBE,**
**et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 169–89L, 170–89L.**

United States Claims Court.

July 1, 1991.

418

Daniel H. Israel, Boulder, Colo., for plaintiffs.

R. Anthony Rogers, with whom were Asst. Attys. Gen. Richard B. Stewart and James M. Upton, Washington, D.C., for defendant. William Swan, Office of the Field Sol., Phoenix, Ariz., of counsel.

## OPINION

ANDEWELT, Judge.

In these consolidated cases, plaintiffs, Fort Mojave Indian Tribe and Colorado River Indian Tribe (referred to herein as the Tribes), seek damages from the United States relating to their alleged loss of water rights for irrigating land on their respective reservations. The purported loss of water rights was the result of the 1963 Supreme Court decision in *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963) (*Arizona I*), and the decree that carried that decision into effect, *Arizona v. California*, 376 U.S. 340, 84

S.Ct. 755, 11 L.Ed.2d 757 (1964) (the 1964 decree). The United States intervened in that litigation and represented the Tribes' interests. In the instant actions, plaintiffs contend that defendant made serious errors while representing plaintiffs' interests in *Arizona I* and that those errors constitute both a breach of trust and an uncompensated taking of plaintiffs' property in violation of the fifth amendment.

The instant actions are presently before the court on cross-motions for summary judgment. For the reasons set forth below, defendant's motion for summary judgment as it relates to plaintiffs' takings claim is granted. Defendant's motion in all other respects and plaintiffs' cross-motion are denied.

### I.

Plaintiffs' respective reservations were created by federal statute and/or executive orders.[1] The statute and executive orders specify the land boundaries within plaintiffs' reservations but do not mention the grant of any water rights. The issue of Indian reservation water rights was addressed by the Supreme Court in *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). Therein, the reservation was created by a treaty which similarly made no reference to water rights. The Court concluded that the absence of a specific allocation of water rights was not dispositive and that the treaty should be interpreted to contain an implied reservation of sufficient water rights for the tribe to carry out the purposes for which its reservation was created. *Id.* at 575–77, 28 S.Ct. at 211–12.

The Supreme Court applied the *Winters* decision to the Tribes' reservations in *Arizona I*. *Arizona I* was an original action filed in the Supreme Court by the State of Arizona against the State of California and seven of its agencies. Therein, Arizona

sought to clarify its title to a specific amount of water from the Colorado River and its tributaries. The States of Nevada, Utah, and New Mexico were joined as parties and the United States intervened to represent both the federal interest and the interests of plaintiffs and three other tribes whose reservations are within the states involved.

After the parties filed their preliminary pleadings, the Court referred the case to a special master to hear the evidence and recommend a decree. The hearing before the special master extended from June 1956 through August 1958 and involved the testimony of 340 witnesses, the receipt of thousands of exhibits, and a transcript of 25,000 pages.

During the hearing, the State of Arizona contended that the tribes' *Winters* water rights should be calculated based on the "reasonably foreseeable needs" of the tribes on their respective reservations. That standard apparently would have resulted in the Supreme Court calculating the tribes' water rights based on the actual number of Indians on each reservation. The United States, representing the Indians, proposed a different standard that would produce significantly higher water allotments for the tribes. The United States argued that the tribes' *Winters* water rights should be calculated so as to permit irrigation of all "practicably irrigable land" on the reservations, *i.e.,* that the statutes and orders creating the reservations should be interpreted to include an implied grant of sufficient water to irrigate all practicably irrigable reservation land. During the hearing, the United States presented evidence to show the amount of such land on plaintiffs' respective reservations.

After the hearing, the special master filed a 433–page report of his findings and legal conclusions, including a recommended

---

1. Executive orders relating to the creation of the Fort Mojave Indian Reservation include: Exec. Order of Sept. 19, 1890, approving Secretary of War's Sept. 18, 1890, recommendation of transfer of the military reservation of Fort Mojave, Arizona; Exec. Order No. 1267, Dec. 1, 1910; Exec. Order No. 1296, Feb. 2, 1911. The statute

and executive orders relating to the creation of the Colorado River Indian Reservation include: Act of March 3, 1865, 13 Stat. 541, 559; Exec. Order of Nov. 22, 1873; Exec. Order of Nov. 16, 1874; Exec. Order of May 15, 1876; Exec. Order of Nov. 22, 1915.

decree. The special master adopted the standard proffered by the United States for calculating the tribes' *Winters* water rights. He concluded "that the water was intended to satisfy the future as well as the present needs of the Indian Reservations and ... that enough water was reserved to irrigate all the practicably irrigable acreage on the reservations." *Arizona I,* 373 U.S. at 600, 83 S.Ct. at 1498. Relying on the evidence presented by the government, the special master also made a determination as to the precise amount of practicably irrigable land located on the respective reservations. In assessing such amounts, the special master resolved certain boundary disputes concerning the tribes' respective reservations.

After briefing and oral argument, the Supreme Court issued its June 3, 1963, decision in *Arizona I.* The Court, in pertinent part, adopted the findings and conclusions of the special master, with the exception of the special master's determination of disputed boundaries. The Court explained:

> We have concluded, as did the Master, that the only feasible and fair way by which reserved water for the reservations can be measured is irrigable acreage. The various acreages of irrigable land which the Master found to be on the different reservations we find to be reasonable.

> We disagree with the Master's decision to determine the disputed boundaries of the Colorado River Indian Reservation and the Fort Mojave Indian Reservation. We hold that it is unnecessary to resolve those disputes here. Should a dispute over title arise because of some future refusal by the Secretary to deliver water

to either area, the dispute can be settled at that time.

*Id.* at 601, 83 S.Ct. at 1498.

The 1964 decree "carr[ied] into effect" the Court's *Arizona I* decision. 376 U.S. 340, 84 S.Ct. 755. The decree allocated water rights among the states and, in Article II, defined each tribe's entitlement to water from its respective state's allotment. Pursuant to Article II, except in periods of water shortage, each state was entitled annually either to the amount of water necessary to irrigate a specified number of acres of land or to a specified number of acre-feet of water, whichever was less.[2]

During shortages, when the annual water supply from the Colorado River measured at a specified location fell below 7.5 million acre-feet, the decree provided that the water would be allocated among the states and tribes on a priority basis without regard to state lines. Priority would be based on the dates on which the states and tribes had perfected their respective rights to the water. *Id.* at 342–43, 84 S.Ct. at 756–57. Article II granted the tribes "perfected rights" to the amount of water allocated to them in Article II for nonshortage periods. The priority dates for those perfected rights corresponded to the dates on which each piece of irrigable acreage was made part of the respective reservations. *Id.* at 344–45, 84 S.Ct. at 757–58. Thus, for example, the irrigable acreage added to the Colorado River Indian Reservation on March 3, 1865, had a priority date of March 3, 1865, for the water allotment corresponding to that acreage.

## II.

The 1964 decree left open certain issues. First, in the event that the disputed reservation boundaries became finally established, plaintiffs' water rights were subject

---

2. Article II, under subdivision (D), specified plaintiffs' rights, in pertinent part, as follows:

 (4) The Colorado River Indian Reservation in annual quantities not to exceed (i) 717,148 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use required for irrigation of 107,588 acres and for the satisfaction of related uses, whichever of (i) or (ii) is less....

 (5) The Fort Mojave Indian Reservation in annual quantities not to exceed (i) 122,648 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use required for irrigation of 18,974 acres and for the satisfaction of related uses, whichever of (i) or (ii) is less....

 *Id.* at 344–45, 84 S.Ct. at 758.

to adjustment by agreement or decree of the Court. *Id.* at 345, 84 S.Ct. at 758. Second, the decree lacked a full listing of "present perfected rights" and priority dates to apply when the Colorado River's annual water supply fell below 7.5 million acre-feet. On the latter issue, Article VI proposed that the Secretary of the Interior and the states secure an agreement as to present perfected rights and priority dates. If such an agreement could not be reached, any party could apply to the Court under Article VI for such a determination. *Id.* at 351–52, 84 S.Ct. at 761–62. In addition, Article IX broadly authorized any party to apply for an amendment to the decree. Article IX provides:

> Any of the parties may apply at the foot of this decree for its amendment or for further relief. The Court retains jurisdiction of this suit for the purpose of any order, direction, or modification of the decree, or any supplementary decree, that may at any time be deemed proper in relation to the subject matter in controversy.

*Id.* at 353, 84 S.Ct. at 762.

The parties initially were unable to reach agreement pursuant to Article VI as to present perfected rights and priority dates. In May 1977, the state parties filed a motion requesting the Supreme Court to resolve these issues. In 1978, the Tribes filed motions to intervene. However, their motions were not limited to Article VI issues. The Tribes sought resolution of existing boundary disputes left open in the 1964 decree and, in addition, sought recalculation of the water rights granted in Article II for certain land indisputably within their respective reservations. On the latter point, the Tribes alleged that their respective Article II allocations were too low because certain practicably irrigable lands within their reservations had not been considered when making the Article II allocations (hereinafter "the omitted acreage"). In their motions, the Tribes blamed the United States for failing originally to submit proof as to the omitted acreage and charged that the United States had had a conflict of interest in *Arizona I* because it represented other interests in addition to those of the Tribes.

In making these allegations, the Tribes apparently relied upon an extensive memorandum, dated August 13, 1975, by William H. Veeder, a government attorney who had represented the United States in *Arizona I* until he was removed from the case in 1955 or 1956. The memorandum alleged that the United States had a conflict of interest when it represented the Tribes in *Arizona I* and specified with precision the amount of practicably irrigable acreage the United States had omitted from its proof at trial.

The United States initially opposed the Tribes' motions to intervene but later reversed its position and indicated that it would not oppose intervention by the Tribes so long as that intervention occurred after entry of a supplemental decree covering Article VI issues. On December 22, 1978, the United States went further and filed its own motion seeking entry of a supplemental decree granting plaintiffs additional water rights. The United States acknowledged that it originally had erred in failing to present evidence concerning the omitted acreage and argued that the Tribes' water rights should be increased to reflect this omitted acreage. The United States recommended appointment of a special master to reconsider the allocation of water rights. The United States expressed the view that the 1964 decree did not foreclose reconsideration of the Article II allocation of water rights and that the Supreme Court properly should reach the merits of whether the allegedly omitted acreage was practicably irrigable.

On January 9, 1979, the Supreme Court entered a supplemental decree, *Arizona v. California,* 439 U.S. 419, 99 S.Ct. 995, 58 L.Ed.2d 627 (1979) (the supplemental decree), addressing the issues specifically left open in Article VI of the 1964 decree. The Supreme Court referred to a special master the Tribes' claims for an increase in their Article II water rights. After conducting hearings, the special master granted the Tribes' motions to intervene and issued an opinion recommending that additional acreage be added to the water rights allotted to

the Tribes in Article II. *Inter alia,* the special master agreed that certain practicably irrigable reservation land had not been included when calculating water rights in *Arizona I* and recommended a corresponding modification of Article II of the 1964 decree.

On review, the Supreme Court rejected the special master's proposal to modify Article II to reflect water rights attendant to the omitted acreage. In a March 30, 1983, decision, the Court stated that "the principles of res judicata advise against reopening the calculation of the amount of practicably irrigable acreage, and Article IX [of the 1964 decree] does not demand that we do so." *Arizona v. California,* 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (*Arizona II*). In refusing to reopen the calculations, the Court appeared to rely in significant part on its "fear that the urge to relitigate, once loosed, will not be easily cabined." *Id.* at 625, 103 S.Ct. at 1394. The Court explained:

> The States have already indicated, if the issue were reopened, that the irrigable-acreage standard itself should be reconsidered in light of our decisions in *United States v. New Mexico,* 438 U.S. 696 [98 S.Ct. 3012, 57 L.Ed.2d 1052] (1978), and *Washington v. Washington Commercial Passenger Fishing Vessel Assn.,* 443 U.S. 658 [99 S.Ct. 3055, 61 L.Ed.2d 823] (1979), and we are not persuaded that a defensible line can be drawn between the reasons for reopening this litigation advanced by the Tribes and the United States on the one hand and the States on the other. It would be counter to the interests of all parties to this case to open what may become a Pandora's Box, upsetting the certainty of all aspects of the decree.

*Id.*

On March 28, 1989, within six years of the Supreme Court's March 30, 1983, decision in *Arizona II,* plaintiffs filed the instant consolidated actions. In their complaints, plaintiffs contend that the government actions that led to the 1964 decree constituted a breach of trust and a fifth amendment taking of plaintiffs' property.

In its motion for summary judgment, defendant argues that (1) the United States never waived sovereign immunity so as to authorize the instant breach of trust action, (2) the facts do not support a fifth amendment takings claim, and (3) in any event, the claims of breach of trust and taking are barred by the statute of limitations. In their cross-motion, plaintiffs seek a finding of government liability on both their breach of trust and fifth amendment takings claims.

III.

"[T]he United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). "In the absence of clear congressional consent ... 'there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States.'" *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980) (*Mitchell I*), quoting *Sherwood,* 312 U.S. at 587–88, 61 S.Ct. at 770.

Defendant bases its contention that the United States did not waive sovereign immunity so as to permit the instant breach of trust action primarily on *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*), and its progeny. However, to understand *Mitchell II,* it is necessary first to understand its predecessor, *Mitchell I.*

In *Mitchell I,* an Indian tribe sought to recover money damages from the United States for alleged mismanagement of timber resources located on reservation land. The tribe contended that the government's mismanagement breached a fiduciary duty owed the tribe under the General Allotment Act of 1887 (the Act), 25 U.S.C. §§ 331 *et seq.* (1976). Section 5 of the Act obliged the United States to "hold the land ... in trust for the sole use and benefit of the [allottee]." 25 U.S.C. § 348. The Court of Claims agreed and concluded that the Act created a fiduciary duty to manage timber resources and waived sovereign immunity so as to authorize a suit seeking damages

for an alleged breach of that duty. *Mitchell v. United States*, 219 Ct.Cl. 95, 98–103, 591 F.2d 1300 (1979).

The Supreme Court reversed and held that Section 5 created only "a limited trust relationship" which did not include any duty to manage timber resources. *Mitchell I*, 445 U.S. at 542, 100 S.Ct. at 1353. The Court noted that Sections 1 and 2 of the Act left the Indians, rather than the United States, "responsible for using the land for agricultural or grazing purposes." *Id.* at 542–43, 100 S.Ct. at 1354. In addition, the Court interpreted the legislative history of the Act as indicating that the Indians, and not the United States, were to manage the land. The Court concluded that Section 5 was intended to prevent alienation of title to the land and to address certain tax issues and was not intended to create broad responsibility for managing reservation resources. *Id.* at 543–44, 100 S.Ct. at 1354. The Court explained:

It is plain, then, that when Congress enacted the General Allotment Act, it intended that the United States "hold the land ... in trust" not because it wished the Government to control use of the land and be subject to money damages for breaches of fiduciary duty, but simply because it wished to prevent alienation of the land and to ensure the allottees would be immune from state taxation.

*Id.* at 544, 100 S.Ct. at 1354. The Court remanded the action to the Court of Claims to determine whether any legal source other than the Act could serve as a basis for the tribe's mismanagement claim. *Id.* at 546, 100 S.Ct. at 1355.

On remand, the Court of Claims found independent support for a breach of trust suit in various federal statutes and regulations that concerned the United States' management of the reservation timber resources. *Mitchell v. United States*, 229 Ct.Cl. 1, 664 F.2d 265 (1981). In *Mitchell II*, the Supreme Court agreed and concluded that "the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the

Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." 463 U.S. at 224, 103 S.Ct. at 2971. In explaining that it was not significant that none of the statutes or regulations used the terms "trust" or "fiduciary," the Supreme Court stated:

[A] fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to the Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds). "[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 183, 624 F.2d 981, 987 (1980).

*Id.* at 225, 103 S.Ct. at 2972 (footnote omitted).

The Court also found that it was not significant that the statutes and regulations did not mention that the United States could be held financially responsible for damages to the Indians resulting from the United States' management decisions. The Court concluded that it was enough that the statutes and regulations created a fiduciary responsibility. The Court stated:

Because the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained. Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties. It is well established that a trustee is accountable in damages for

breaches of trust. *See Restatement (Second) of Trusts* §§ 205–212 (1959); G. Bogert, *Law of Trusts and Trustees* § 862 (2d ed. 1965); 3 A. Scott, *Law of Trusts* § 205 (3d ed. 1967). This Court and several other federal courts have consistently recognized that the existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust.

*Id.* at 226, 103 S.Ct. at 2972.

## IV.

■ As explained above, the Tribes' reservations herein were established by statute and executive orders. The statute and orders did not explicitly use the terms "trust" or "fiduciary," nor did they mention any potential government financial liability. But, as explained in *Mitchell II,* the absence of such references is not determinative in assessing whether sovereign immunity was waived so as to permit a breach of trust suit. Rather, the crucial issue is whether the pertinent statute and executive orders created a trust relationship which covered the government's actions when representing plaintiffs' interests in *Arizona I.* "Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." *Id.*

Defendant concedes that the legal effect of the statute and executive orders creating the Tribes' reservations was to create a trust arrangement pursuant to which the United States held in trust for the Tribes legal title to both their reservation land and any corresponding vested water rights. Defendant also concedes that if the Department of the Interior sold existing title to the land or existing water rights to a third party, the transfer would constitute a breach of that trust. Defendant contends, however, that defendant's actions during *Arizona I* are not equivalent to a sale of existing water rights and, hence, cannot be the basis for a breach of trust action.

■ Defendant first argues, in effect, that plaintiffs did not possess any defined existing water rights at the time defendant represented plaintiffs' interests in *Arizona I,* and, hence, no improvident transfer of such rights could have occurred. Defendant notes that it was not until its decision in *Arizona I* that the Supreme Court enunciated the "practicably irrigable land" standard for quantifying the *Winters* implied reservation of water rights. Hence, defendant argues, until the *Arizona I* decision, plaintiffs did not possess defined water rights based on such a standard.

But *Winters* stands for the proposition that the reservation grant itself contains the implied reservation of water rights, *i.e.,* that the rights are vested with the reservation grant. *Winters,* 207 U.S. at 576, 28 S.Ct. at 211. *See also Arizona I,* 373 U.S. at 600, 83 S.Ct. at 1497. The water rights allegedly transferred to the states by the Supreme Court in *Arizona I* therefore were real, existing rights, not mere expectancies. *Contrast Allied–General Nuclear Services v. United States,* 839 F.2d 1572, 1575 (Fed.Cir.1988). The fact that the scope of those rights had not previously been articulated in the manner in which they were in *Arizona I* does not mean those rights did not exist or that they could not be improperly transferred.

Defendant's second argument focuses on the nature of the conduct of which plaintiffs complain, *i.e.,* defendant's representation of plaintiffs in *Arizona I.* Defendant contends that plaintiffs have failed to identify any statute, regulation, or executive order imposing any duty upon the United States to adjudicate tribal water rights or to litigate such rights in *Arizona I* in the manner plaintiffs allege they were owed. Absent such a provision, defendant contends that under *Mitchell II,* sovereign immunity was not waived and a breach of trust action does not lie.

■ As noted above, defendant concedes that the statute and executive orders that created the Tribes' respective reservations had the effect of creating a trust arrangement pursuant to which the government held title to plaintiffs' water rights. But

defendant argues, in effect, that the responsibilities inherent in such a trust arrangement would extend only to the United States transferring plaintiffs' water rights through sale to a third party and would not also reach the United States' representation of the Tribes' interests during litigation in which ownership of those rights was at stake. But defendant too narrowly interprets the responsibilities of a trustee in this regard. Where a trust relationship exists, "[t]he trustee has a duty to protect the trust property against damage or destruction. He is obligated to the beneficiary to do all acts necessary for the preservation of the trust res which would be performed by a reasonably prudent man employing his own like property for purposes similar to those of the trust." G. Bogert, *The Law of Trusts and Trustees* § 582 (2d ed. revised 1980); *see also Restatement (Second) of Trusts*, § 176 (1959).

Here, the title to plaintiffs' water rights constitutes the trust property, or the res, which the government, as trustee, has a duty to preserve. Defendant's obligation to perform "all acts necessary" to preserve the trust res would necessarily include prudently representing plaintiffs' interests in litigation in which ownership to those water rights is placed in issue. Indeed, the effect on the trust res would be no different whether the United States sold plaintiffs' water rights to a third party or those rights were effectively transferred to a third party pursuant to a Supreme Court decision. In either case, plaintiffs would lose their water rights.

Thus, herein, similar to the statutes and regulations in *Mitchell II*, the statute and executive orders establishing the Tribes' respective reservations created a trust arrangement between plaintiffs and the United States. As in *Mitchell II*, the creation of this trust was sufficient to waive sovereign immunity so as to permit an action alleging a breach of that trust. Hence,

plaintiffs' allegation that the government breached that trust by failing adequately to represent plaintiffs' interests in *Arizona I* properly states a claim for breach of trust addressable in this court.

■■■ In addition to being a natural consequence of the creation of the trust, the United States' authority to represent the Tribes' interests during litigation is specifically set forth in 25 U.S.C. § 175, which provides, in pertinent part: "In all States and Territories where there are reservations ... the United States attorney shall represent them in all suits at law and in equity." Citing law relating generally to the responsibilities of the Department of Justice under 25 U.S.C. § 175 and related statutes, defendant contends that the prosecution of actions by the United States on the Tribes' behalf is totally discretionary and, therefore, the government's conduct of litigation cannot possibly give rise to a breach of trust action. 28 U.S.C. § 516; *United States v. Smith*, 523 F.2d 771, 782 (5th Cir.1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976), *reh'g denied*, 429 U.S. 987, 97 S.Ct. 509, 50 L.Ed.2d 599 (1976); *Weisberg v. United States Dep't of Justice*, 489 F.2d 1195, 1201 (D.C.Cir.1973).[3] But while it is true that the government ordinarily has broad discretion as to when to institute an action on behalf of Indians, *see, e.g., Creek Nation v. United States*, 318 U.S. 629, 639, 63 S.Ct. 784, 789, 87 L.Ed. 1046 (1943), it does not follow that the government is free from accountability for its actions herein.

■■■ First, as noted above, where a trust exists with respect to a defined res, the trustee is charged with taking appropriate steps to preserve that res. Therefore, the United States was required under the trust arrangement to defend plaintiffs' water rights in *Arizona I*. Second, plaintiffs do not fault defendant for refusing to represent plaintiffs' interests in *Arizona I* but

---

**3.** In contending that the requirements of *Mitchell II* were satisfied, plaintiffs also rely upon the federal laws appropriating millions of dollars to construct water delivery facilities and to educate farmers. But these laws alone do not serve as an independent basis supporting a

breach of trust claim. They do not establish any fiduciary obligation on the federal government that reaches the government's litigation of claims involving the extent of plaintiffs' water rights.

rather for choosing to represent their interests and then doing so inadequately. Plaintiff Colorado River Indian Tribe and other tribes (not including plaintiff Fort Mojave Indian Tribe) had argued during the initial hearings before the special master in *Arizona I* that because of the United States' alleged conflict of interest, the special master should appoint separate counsel to represent the tribes. The United States, in its response filed with the special master, opposed this motion, *inter alia*, on the ground that the United States had "full and exclusive authority to control the presentation of the Indian's interests in the instant case." Therefore, the United States not only made the decision to represent plaintiffs' interests in *Arizona I* but also chose to exercise control over plaintiffs' defense of their water rights. As the Court concluded in *Mitchell II*, "[a] fiduciary relationship necessarily arises when the Government assumes such elaborate control over ... property belonging to Indians." *Mitchell II*, 463 U.S. at 225, 103 S.Ct. at 2972.

Defendant bases its motion for summary judgment as it relates to plaintiffs' breach of trust claim on defendant's allegation that the United States had not waived sovereign immunity. Because this court concludes that the United States has waived sovereign immunity, defendant's motion for summary judgment on this issue is denied.

### V.

■ As an alternative to their breach of trust claim, plaintiffs present a takings claim. Plaintiffs allege that the United States' conduct in *Arizona I* violates the fifth amendment's prohibition against the government taking property "for public use without just compensation." This court agrees that the water rights impliedly granted when plaintiffs' reservations were established constitute private proper-

ty within the protection of the fifth amendment. But the court cannot agree that the United States' conduct during *Arizona I* can properly be characterized as a taking of that property for public use.

■ "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Such fundamental constitutional interests simply are not involved here.

The governmental entity that allocated the water rights in issue to the states rather than to plaintiffs was the Supreme Court. In *Arizona I*, the Court interpreted the pertinent laws, applied those laws to the facts before it, and fashioned a decree to give effect to its conclusions. But plaintiffs do not base their takings claim on a contention that the Supreme Court's actions constituted the taking.[4] Indeed, plaintiffs do not even contend that in *Arizona I* the Supreme Court was incorrect either in interpreting the law or in applying the law to the facts before it. Rather, plaintiffs contend, in essence, that when representing plaintiffs' interests in *Arizona I*, the Department of Justice lawyers failed to present evidence to the Supreme Court to demonstrate that the omitted acreage was practicably irrigable.

But the government lawyers' selection of evidence, no matter how unsound, cannot be characterized as a fifth amendment taking of property for public use. The government lawyers were not acting in a sovereign capacity and taking plaintiffs' property for the benefit of others. They were not "forcing some people alone to bear public burdens which ... should be

---

**4.** Nor could they. Courts do not "take." Under the Constitution, the legislative and executive branches of the government are granted the power to make the types of policy decisions which deprive individuals of their private property by making that property available for pub-

lic use. Courts have no such policy prerogative. Their function is limited to interpreting and applying the laws and regulations of the legislative and executive branches to the facts before them.

borne by the public as a whole." *Id.* Rather, the lawyers were simply acting in a fiduciary capacity and making litigation decisions as counsel representing plaintiffs' interests. Any obligation that counsel owed to the Tribes in the selection and presentation of evidence must reasonably stem from the government's trust relationship and fiduciary duties with respect to the Tribes. The independent guarantees of the fifth amendment are not remotely involved here. Plaintiffs' admittedly novel fifth amendment takings claim is therefore unsound, and defendant's motion for summary judgment on that claim is granted and plaintiffs' cross-motion is denied.

## VI.

### A.

■ Next, defendant argues that, in any event, any claim sounding in breach of trust (or in violation of the fifth amendment) would be barred by the statute of limitations. The applicable statute of limitations obliges the filing of a claim "within six years after such claim first accrues." 28 U.S.C. § 2501. The instant claims were filed on March 28, 1989. Therefore, the claims are barred by the statute of limitations if they accrued before March 28, 1983.

"[A] cause of action against the government 'first accrued' only when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir.1988) (emphasis omitted). "The statute of limitations applies to Indians the same as to anyone else." *Fort Mojave Tribe of Indians v. United States*, 210 Ct.Cl. 727, 728, 546 F.2d 429 (1976).

Herein, defendant contends that plaintiffs' claims first accrued in 1963 and, in any event, no later than 1975. Defendant argues that "all the events which fix the government's alleged liability" had occurred by 1963 when the Supreme Court made its adjudication of plaintiffs' water rights in *Arizona I.* As to plaintiffs'

knowledge of the government's actions underlying this alleged liability, defendant contends that the government actions were open, notorious, and knowable and, hence, plaintiffs should be charged with knowledge of the actions as of 1963. In any event, defendant asserts, plaintiffs had actual knowledge of the circumstances surrounding the omitted acreage by 1975 when they became aware of the August 13, 1975, Veeder memorandum.

Ultimately, the court disagrees with defendant's approach. Instead, the court concludes that the events which fix the government's alleged liability for a breach of trust did not occur until March 30, 1983, when the Supreme Court in *Arizona II* refused to amend Article II of the 1964 decree so as to include water rights covering the omitted acreage.

This conclusion stems in part from Article IX of the 1964 decree. In Article IX, the Supreme Court authorized any party to apply for an amendment to the decree and the Court specifically retained jurisdiction to enter any decree modifications "that may at any time be deemed proper in relation to the subject matter in controversy." Thus, while the decree contained provisions that allegedly stripped plaintiffs of certain of their water rights, it also created a mechanism by which the United States potentially could re-secure those rights for plaintiffs. The wording of Article IX is clearly broad enough to permit the United States to seek amendment to the decree, as it did, to provide additional water allotments based on the omitted acreage.

The government's trust responsibilities to plaintiffs with respect to these water rights were of an ongoing, continuing nature. The trust relationship did not end with the 1963 decision or the 1964 decree. Thus, even assuming that the United States had initially engaged in conduct inconsistent with its trust obligations, Article IX appeared to permit the United States, in furtherance of its continuing trust responsibilities, to seek modification of the 1964 decree so as to eliminate any possible dam-

age to plaintiffs.[5]

Defendant, in effect, so interpreted Article IX. In a 1978 motion to the Supreme Court, defendant acknowledged that it had erred during the *Arizona I* hearing when it failed to secure water rights for the omitted acreage.

> [C]loser study has disclosed that we committed errors in failing to appreciate the irrigable character of certain acreage. Although we deny any deliberate failure faithfully to advocate the rights of the Tribes—whether on account of a conflict of interest or any other reason—the complexity of the issues before the Special Master contributed to inadvertent omissions, as well as erroneous judgments, in identifying irrigable acreage within the several reservations.

In that motion, the United States sought modification of the 1964 decree so as to redress this error. Ultimately, the United States convinced the special master to recommend that the Supreme Court modify the decree so as to include water rights for the omitted acreage. Such a change apparently would have eliminated any possible damage to plaintiffs from the 1964 decree. *See supra* note 5.

In this factual context, plaintiffs' breach of trust action must be deemed to have first accrued with the Supreme Court's 1983 decision in *Arizona II*. Article IX of the 1964 decree had left the Article II allocation of water rights subject to potential subsequent modification. The United States proceeded in *Arizona II* to seek such a modification on the grounds that it had erred in *Arizona I* and that plaintiffs were entitled to the water rights in dispute. In seeking such a modification and asserting these grounds, defendant was acting pursuant to its continuing trust responsibilities with respect to plaintiffs' water rights. Since the ultimate outcome of the United States' continuing trust actions (both pre-

and post-1963) remained very much in doubt until the Supreme Court's 1983 decision, "all the events" which fixed liability for a breach of trust had not occurred until the issuance of that decision.

The court recognizes that well-established precedent holds that an Indian's trust status does not itself toll the statute of limitations and that except possibly for an express trust, which is not involved here, there is no requirement that the United States repudiate or terminate a trust before the statute of limitations for a breach of that trust will commence to run. *See Menominee Tribe of Indians v. United States,* 726 F.2d 718, 721 (Fed.Cir.1984), *cert. denied,* 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984), and cases discussed therein. But the court here does not base its conclusion that the statute of limitations did not run merely on the existence of a trust or on the government's failure to repudiate that trust. Rather, here, the government affirmatively acknowledged that it had erred, took the position that plaintiffs were entitled to the water rights in dispute, and commenced to take actions in furtherance of its trust responsibilities aimed at resecuring those rights for plaintiffs. This acknowledgement of error and commencement of authorized actions aimed at resecuring the trust res distinguishes the instant case from all of the Indian trust cases cited by defendant. *Id., discussing Capoeman v. United States,* 194 Ct.Cl. 664, 440 F.2d 1002 (1971).

Thus, given Article IX of the 1964 decree, the ongoing nature of this trust relationship, and defendant's acknowledgement of its error, any Claims Court action brought by plaintiffs for a breach of trust prior to the 1983 decision in *Arizona II* would have been premature. The court reasonably would have concluded that liability would not have been fixed for a potential breach of trust action against the

5. In their respective complaints, plaintiffs indicate that they had been using only approximately 80% of the water rights they had been allotted under the 1964 decree. This strongly suggests that at the time the complaints were filed, plaintiffs had not been significantly harmed by the failure of the Supreme Court in 1964 to allot additional water rights to plaintiffs. In any event, Article IX maintained jurisdiction in the Supreme Court to modify the decree in any way that "may at any time be deemed proper." Therefore, the Court potentially could redress any damage that had been caused as a result of an improper allotment of water rights.

United States until either the government made a final determination not to seek reconsideration under Article IX or the Supreme Court issued a final decision on any such government effort to secure water rights for the omitted acreage.

### B.

■ In response, defendant contends that the Supreme Court's conclusion in *Arizona II* that Article IX could not be used to secure water rights for the omitted acreage necessarily demands the conclusion that plaintiffs' water rights became permanently fixed in 1963. But the wording of Article IX is clearly broad enough to support the view, then urged by the United States and adopted by the special master, that Article IX could be used to secure reconsideration of the amount of practicably irrigable land on the reservations. Indeed, in concluding to the contrary, the Supreme Court focused on practical considerations relating to a Pandora's Box of issues raised by other parties that would also have to be addressed if the Court were to reconsider plaintiffs' water rights. Until the Supreme Court issued its 1983 decision, Article IX remained a potentially viable method for the government to further its trust responsibilities and correct its acknowledged error.

■ Next, defendant cites *Sohm v. United States*, 3 Cl.Ct. 74, 79 (1983), and *Shermco Indus., Inc. v. United States*, 6 Cl.Ct. 588, 593 (1984), for the proposition that the statute of limitations is not tolled when, as in the instant actions, a party unsuccessfully seeks equitable relief in federal court prior to bringing an action seeking monetary relief in the Claims Court. Defendant argues that *Sohm* and *Shermco* apply here because plaintiffs were seeking equitable relief in the Supreme Court when they should have brought their breach of trust claim in the Claims Court.

*Sohm* and *Shermco* involve litigation brought in response to disputed actions by federal agencies. In each case, the allegedly aggrieved parties delayed instituting Claims Court actions based on the disputed agency actions until after the parties were unsuccessful in seeking equitable relief in district court. But the Supreme Court here is in an analogous position to the federal agencies in *Sohm* and *Shermco*, and not to the district court. Here, plaintiffs and the government asked the Supreme Court to modify its *own* decision as opposed to overturning the decision of another governmental entity. In *Sohm* and *Shermco*, the agency decisions represented the final determinations of the agencies on the parties' rights and, hence, served to fix government liability. In the instant actions, the Supreme Court's 1983 decision, in effect, represented the final decision of the Supreme Court on the water rights issue. Until that decision, liability was not fixed for a breach of trust action.

Arguably more pertinent precedent than *Sohm* or *Shermco* is *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). *Dickinson* involved a takings claim in the Court of Claims in which the property owner alleged that the government's construction of a dam resulted in a flooding of his land. The dam construction caused a river's water level to rise in successive stages and the extent of the flooding of the property owner's land changed over time. The government alleged that the takings claim was barred by the statute of limitations on the ground that more than six years prior to the filing of the action, the river had risen sufficiently to submerge part of the property owner's land. The Supreme Court concluded that the statute of limitations would not have run even if it were assumed that the property owner could have instituted a takings claim at the time of the initial flooding. The Court explained:

> We are not now called upon to decide whether in a situation like this a landowner might be allowed to bring suit as soon as inundation threatens. Assuming that such an action would be sustained, it is not a good enough reason why he must sue then or have, from that moment, the statute of limitations run against him. If suit must be brought, lest he jeopardize his rights, as soon as his land is invaded, other contingencies

would be running against him—for instance, the uncertainty of the damage and the risk of res judicata against recovering later for damage as yet uncertain. The source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous. And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck.

*Id.* at 749, 67 S.Ct. at 1385.

While the instant facts differ widely from *Dickinson,* the Court's analytical approach fits fairly well. Herein, in the context of both Article IX of the 1964 decree and the government's acknowledgement of its error, defendant's trust responsibilities with respect to plaintiffs' water rights should not be viewed as involving a single event but rather a continuous series of events. Depending on the Supreme Court's ultimate resolution of the Article IX issue, it remained possible that any error in the 1964 decree could have been completely corrected and any possible damage to plaintiffs avoided. Given Article IX, the trust relationship, and defendant's acknowledgement of its error, it would be quite natural for plaintiffs to "postpone bringing a suit against the Government for [the breach of trust] until the consequences [of the breach of trust had] so manifested themselves that a final account may be struck." *Id.*

This court rejects defendant's contrary approach. Defendant's approach would have plaintiffs' breach of trust claim accrue at a time when defendant's trust actions aimed at protecting the trust res were continuing and when it was not apparent that plaintiffs had suffered, or ultimately would suffer, any damages from defendant's earlier actions. Indeed, defendant's approach would demand that plaintiffs file their breach of trust action at a time when,

rather than assuming a position adverse to plaintiffs' interests, the United States had acknowledged its error and was working hand in hand with plaintiffs in an effort to redress that error in the Supreme Court. None of the breach of trust precedent relied upon by defendant supports such a result.

For the reasons explained above, "all of the events which fix the government's alleged liability," *Hopland Band of Pomo Indians,* 855 F.2d at 1577, had not occurred until the Supreme Court's decision in *Arizona II.* That decision was issued less than six years before the instant actions were filed. Hence, defendant's motion for summary judgment on the grounds that the breach of trust action is barred by the statute of limitations must be denied.

## VII.

In their cross-motion, plaintiffs seek summary judgment on the breach of trust claim. Plaintiffs stress that defendant has acknowledged that it erred in failing to present evidence as to the omitted acreage in *Arizona I* and that the special master in *Arizona II* agreed that such an error had occurred. To support the conclusion that this recognized error constitutes a breach of trust, plaintiffs present an affidavit from an engineer to the effect that the United States must have failed to use then-existing and widely accepted engineering methods when it calculated the amount of practicably irrigable acreage in *Arizona I.*

 But all conduct that with the benefit of hindsight can be said to be an error does not rise to the level of a breach of trust. Indeed, there is some evidence in the record that suggests defendant made fairly reasoned determinations when deciding what evidence to present in *Arizona I.* Moreover, the presentation of evidence as to the quantity of practicably irrigable land was only one part of defendant's representation of plaintiffs' interests. Defendant gained many significant victories for the Tribes in *Arizona I,* including a major victory in having the Supreme Court define the Tribes' *Winter* water rights so broadly

as to encompass the water necessary to irrigate all practically irrigable land on their respective reservations. That definition clearly does not flow inevitably from the *Winters* decision. Indeed, subsequent court decisions arguably have suggested a somewhat less generous standard for assessing a tribe's implied water rights. *See, e.g., Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 685–86, 99 S.Ct. 3055, 3074, 61 L.Ed.2d 823 (1979); *Gila River Pima–Maricopa Indian Community v. United States,* 231 Ct.Cl. 193, 211–14, 684 F.2d 852, 863–65 (1982).

■ In determining whether the government breached its trust responsibilities in *Arizona I,* this court will have to take a close look at what the government did and why it did it, and then place the suspect actions in the context of defendant's overall representation of plaintiffs' interests during the litigation. Indeed, the Supreme Court appeared to perform an analogous inquiry in *Arizona II* when it evaluated the allegation that the United States had a conflict of interest in *Arizona I.* After reviewing the record, the Court rejected the contention that the government's representation of plaintiffs' interests in *Arizona I* had been inadequate. The Court stated:

> In this case, there is no demonstration that the United States, as a fiduciary, was involved in an actual conflict of interest. From the initiation of this case, the Government has taken seriously its responsibility to represent the Tribes' interests, and we have no indication that the Government's representation of the Tribes' interests with respect to the amount of practicably irrigable acreage was legally inadequate.... Indeed, the substantial water allocations awarded the Tribes reflect the competency of the United States' representation. We believe the issue of practicably irrigable acreage was fully and fairly litigated in 1963.

*Arizona II,* 460 U.S. at 627–28, 103 S.Ct. at 1396.

At this point, the evidence before this court is not sufficient to make a final determination on the breach of trust issue. Plaintiffs have not demonstrated the absence of any material issue of fact concerning a breach of trust and their cross-motion for summary judgment in this regard must be denied.

### Conclusion

For the reasons set forth above, defendant's motion for summary judgment as it relates to plaintiffs' fifth amendment takings claim is granted. Defendant's motion in all other respects and plaintiffs' cross-motion are denied.

On or before July 31, 1991, the parties shall file a status report, jointly or separately, proposing scheduling for further proceedings in this action.

IT IS SO ORDERED.