**TE–MOAK BANDS OF WESTERN SHOSHONE INDIANS OF NEVADA, suing on Behalf of the Western Shoshone Nation of Indians, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 326–A.**

United States Claims Court.

Sept. 18, 1989.

See also 18 Cl.Ct. 82.

Frances L. Horn, Washington, D.C., for plaintiffs.

James M. Upton, with whom was Asst. Atty. Gen. Roger J. Marzulla, for defendant.

## OPINION

SMITH, Chief Judge.

This matter, presently pending before the court on defendant's motion to dismiss plaintiffs' water claims pursuant to Rule 12(b)(1) of the Rules of the United States Claims Court (RUSCC), is yet another chapter in a long, complex proceeding spanning thirty-eight years. The dispute centers upon whether plaintiff's water claims, presented explicitly by plaintiffs for the first time in their supplemental and amended exceptions filed on June 10, 1982, fall within the scope of plaintiffs' original petition. For the reasons set forth below, the court finds that plaintiffs' water claims are outside of the scope of that petition. Accordingly, defendant's motion to dismiss must be granted.

## FACTS

### Background

On August 10, 1951, the Western Bands of the Shoshone Nation of Indians (Western Shoshones), represented by the Te–Moak Bands of Western Shoshone Indians, Nevada (Te–Moak Bands), filed a claim against defendant before the Indian Claims Commission (Commission) pursuant to the Indian Claims Commission Act, 60 Stat. 1049 (1946), *repealed by* 90 Stat. 1990 (1976). This claim was part of a joint petition filed by all of the Shoshone Indian tribes (Shoshones). The joint petition sought relief from the alleged taking of former Shoshone lands without just compensation by defendant and by white settlers. The petition also requested relief from defendant's alleged misuse of funds and proceeds held in trust for the Shoshones, all of which originally had been acquired by the Shoshones as a result of various treaties and legislative acts. As part of the Shoshones' request for relief from this misuse, they asked that defendant provide a general accounting of the trust. The purpose of the general accounting claim was to apprise plaintiffs of the facts concerning the trust, since the rele-

vant records were in the exclusive possession of defendant.

As part of the joint petition filed in 1951, the Te–Moak Bands, filing on behalf of the Western Shoshones, sought just compensation for lost California and Nevada lands. The Te–Moak Bands also requested a general accounting of, and relief from, the misuse of the Western Shoshones' trust funds and proceeds derived from the Treaty of Ruby Valley and from various other Acts of Congress. The relevant portions of that petition specifically stated as follows:

Count 1. Taking of Lands

WHEREFORE, petitioner ... prays that it ... be awarded ... just compensation ... which would be due had defendant dealt fairly and honorably with ... [the petitioners] ... for the lands ... disposed of or otherwise used or taken by defendant, and damages for loss of use or occupancy ... from the time they were disposed of or converted or leased or used by defendant, and for such other and further relief as ... may seem fair and equitable.

Count 2. General Accounting

.... At all times mentioned herein, the books of account and all other records pertaining to all moneys [and other property] ... for said Western Bands of the Shoshone Nation of Indians, ... have been in the exclusive, possession of defendant. Proceeds of property of said bands ... have been payable to or collected by defendant, and by it dealt with and disposed of including, without limitation, moneys payable under:

[The] Treaty of Ruby Valley, October 1, 1863, 18 Stat. 689, 2 Kappler 851, Art. 7; ... [and the] Act of March 3, 1883, 1, c. 141, 22 Stat. 582, 590 (25 U.S.C. § 155) [and other Acts of Congress]....

At all times referred to herein, defendant has been under a duty to pay interest on funds of said bands....

At all times referred to herein, defendant has been under a duty as guardian

and trustee of said bands ... to invest funds of said bands....

Upon information and belief, petitioner alleges that ... defendant itself has become liable to pay moneys to ... said bands. Defendant has failed to account for its management, ... of said moneys and properties. As a result, said bands have been damaged by having been deprived of the amount of money or value of other property, together with interest thereon, which may be shown to be owing to them upon a proper accounting in accordance with the fiduciary duties and the liabilities herein set forth.

WHEREFORE, petitioner prays that defendant be required to make a full, just and complete accounting for all property or funds received or receivable and expended for and on behalf of said Western Bands of the Shoshonee [sic] Nation of Indians, ... and that judgment be entered for petitioner, ... in the amount shown to be due under such an accounting; and for such other relief as ... may appear just and proper.

All of the Shoshones' claims proceeded before the Indian Claims Commission under docket number 326 until 1957. In 1957, the Indian Claims Commission ordered all of the general accounting claims to be severed from the original petition into separate causes of action for each group of Shoshones. The general accounting claim filed by the Te–Moak Bands on behalf of the Western Shoshones thus was severed from docket number 326 to form an entirely separate cause of action. This action was given docket number 326–A, and is the cause of action presently before the court.

*Plaintiffs' Taking Claim*

All of the Shoshone Indian tribes proceeded with their taking claims throughout the 1950s and early 1960s. On October 16, 1962, the Commission determined that the Shoshones had a compensable property interest at one time and that their lands had been taken by defendant.[1] *See generally*

1. Indian taking claims before the Commission generally are divided into three phases: the title phase; the value phase; and the offset phase. During the title phase, the Commission deter-

*Shoshone Tribe v. United States*, 11 Ind. Cl.Comm. 387 (1962). These compensable property interests included the Western Shoshones' lost California and Nevada lands. The Commission also established the time at which California lands had been taken but could not decide the taking date for the Nevada lands. The date for the Nevada lands later was established by stipulation, which stated that the Nevada lands had been taken as of July 1, 1872.

Lastly, the Commission found that the Western Shoshones were separate from the Shoshones and that the Te–Moak Bands were representative of the Western Shoshones. *Id.* at 466. In accordance with that finding, the Commission then issued an order on August 16, 1967, requiring the Te–Moak Bands to file a separate petition on behalf of the Western Shoshones. This amended petition was docketed under number 326–K.

Under docket number 326–K, the Commission determined that the value of all the land taken from the Western Shoshones was worth $26,154,600.00. *Te–Moak Bands of W. Shoshone Tribe of Indians v. United States*, 29 Ind.Cl.Comm. 5 (1972). The Commission then offset this amount by $9,410.11 because defendant had provided some compensation for these lands under the Treaty of Ruby Valley. *Te–Moak Bands of W. Shoshone Tribe of Indians v. United States*, 40 Ind.Cl.Comm. 318, 387 (1977), *aff'd on other grounds*, 219 Ct.Cl. 346, 593 F.2d 994 (1979), *cert. denied*, 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). This left the Western Shoshones with an award of $26,145,189.89.

This final award was certified to the General Accounting Office (GAO) on December 6, 1979, and the case was marked closed on February 5, 1980.[2] Under 25

U.S.C. §§ 1402, 1403 (1982), the Secretary of the Interior then was required to submit a plan for distribution of this award after it had consulted with the Indians. To this court's knowledge, no plan has been submitted as of this date.[3] *Id.*

### *Plaintiffs' General Accounting Claim*

The proceedings under plaintiffs' severed general accounting claim, still pending before this court, have moved forward on a slower track than plaintiffs' taking claim. There was no activity on plaintiffs' general accounting claim until the 1960s, some ten to fifteen years after the original petition was filed in 1951. In fact, plaintiffs' amended petition for its general accounting claim under docket number 326–A was not filed until 1967, ten years after the general accounting was ordered severed from the original joint petition.

Plaintiffs' amended petition was essentially the same as its general accounting claim in the joint petition filed in 1951, but the amended petition also stated that:

> [D]efendant was ... the guardian and trustee of the property and affairs of petitioner and ... was ... subject to a high degree of fiduciary obligation and required to deal fairly and honorably with them as to their property.... [T]he Western Shoshone Indians were full blooded blanket Indians, unable to read, write, speak, or understand English.... [They] had little conception of the value in money of the vast properties which they owned or occupied.... Their manner of living and means of sustenance required that all of their aboriginal lands, or at least an equivalent area, be held and preserved for them and protected

mines whether the Indians have a compensable property interest at stake. During the value phase, the Commission determines the value of the property interest. In the offset phase, the Commission determines whether the government shall be allowed to offset the amount awarded under the evaluation. These offsets consist of moneys or other property voluntarily given to the Indians on behalf of the government. *See* Indian Claims Commission, Annual Report, 1975, Appendix 6.

**2.** Proceedings on the issue of attorney's fees continued, however, until June 3, 1981. *United States v. Dann*, 470 U.S. 39, 43–44, 105 S.Ct. 1058, 1061, 84 L.Ed.2d 28 (1985).

**3.** This fund established on behalf of the Indian claims under docket number 326–K should not be confused with those trust funds disputed under the general accounting claim involved in this case.

against the encroachments of civilization and invasion by whites.

The procedure utilized by the Commission for the resolution of plaintiffs' accounting claim was adopted from the procedure used in *Sioux Tribe v. United States,* 105 Ct.Cl. 725, 64 F.Supp. 312, *cert. denied,* 329 U.S. 680, 67 S.Ct. 121, 91 L.Ed. 599 (1946). *See Te–Moak Bands of W. Shoshone Indians v. United States,* 23 Ind.Cl. Comm. 70 (1963), *aff'd in part & rev'd in part sub nom., United States v. Mescalero Apache Tribe,* 207 Ct.Cl. 369, 518 F.2d 1309, *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). According to that procedure, all accounting claims were to be initiated by the standard filing of a complaint. Defendant in such cases was not to respond by immediately filing an answer, but instead was required to issue a report from the General Services Administration (GSA).

This report from the GSA was to contain an accounting of the trust fund originally awarded to the Indians as a result of various treaties and legislative acts. The accounting was to include the dates on which the funds were awarded. The accounting also was required to detail how those funds were invested and disbursed. The Indian petitioner was required to file its specific objections within ninety days from the accounting. These objections were to be aimed at any violations or discrepancies caused by defendant with respect to the trust. Finally, once these objections were made, defendant was to file its answer within the usual period of time.

In this case, the GSA report was filed on September 18, 1968, and included an accounting of two trust funds. The first trust fund was derived from the Treaty of Ruby Valley, *supra,* which originally provided the Western Shoshones with a trust fund of a cumulative annuity of $100,-000.00 to be paid over twenty years in $5,000.00 installments. This sum was in return for game rights and privileges ceded by the Indians to the white settlers. The second trust fund, called the "Indian Money, Proceeds of Labor" (IMPL) trust fund, was derived from the Act of March 3, 1883 (now codified at 25 U.S.C. § 155 (1982)). This fund subsequently was carried on separate books of account under "Proceeds of Labor, Western Shoshones, Indians, Nevada," in accordance with the Act of July 1, 1930, 25 U.S.C. § 161b (1982).

Plaintiffs responded by filing two sets of exceptions to the GSA accounting report. The first set of exceptions, which contained eleven alleged violations, was filed in February of 1969. The second set of exceptions, which contained three more alleged violations, was filed on November 30, 1973. All of these exceptions were directed toward defendant's alleged misuse and failure to account for certain items in those trusts.[4]

In the late 1970s and early 1980s, plaintiffs' accounting claim was transferred twice. It first was transferred from the Indian Claims Commission to the Court of Claims when the Commission was terminated in 1978; it again was transferred from the Court of Claims to this court on October 7, 1982. *See General Order No. 1,* 1 Cl.Ct. xxi (1982).

On June 29, 1982, several months before plaintiffs' claim was transferred to this court, plaintiffs filed three more exceptions to defendant's GSA accounting report. The last of these three exceptions was concerned with one of the trust funds accounted for in that report. The first two exceptions, however, were not based on any misuse of the two trust funds previously disputed, but were concerned with defendant's alleged misuse of plaintiffs' water rights on plaintiffs' reservation.

The first of these two water rights exceptions alleged that defendant was liable for its failure to provide reservoirs for the reservations awarded to the Western Shoshones under the Treaty of Ruby Valley.

---

4. During this time, the Commission was able to resolve many of these issues, and as a result of one of the Commission's decisions, defendant later filed a supplemental accounting by the GSA. *See Te–Moak Bands of W. Shoshone Indi-* ans, 23 Ind.Cl.Comm. at 70. This supplemental accounting, filed on July 26, 1974, provided further information on both the Treaty of Ruby Valley trust fund and the IMPL trust fund.

The second exception, based on the Winters Doctrine, *see generally Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908); Florio, *Water Rights: Enforcing the Federal–Indian Trust After Nevada v. United States*, 13 Am.Indian L.Rev. 79 (1987), faulted defendant for failing to prevent white settlers from diverting nearby water away ˙from those reservations. All of the information concerning these water claims was obtained from independent research, and the results of that research were appended to the exceptions.

Without addressing the merits of plaintiffs' water claims, defendant moves to dismiss them, contending that these claims are outside the scope of defendant's original petition filed in 1951. This court subsequently severed those claims from plaintiffs' other objections to address more readily defendant's procedural contentions.

## DISCUSSION

■ The issue of whether plaintiffs' exceptions to defendant's GSA accounting report are within the scope of plaintiffs' original petition filed with the Indian Claims Commission in 1951 is not merely procedural; it is jurisdictional. Causes of action brought by Indian claimants against the United States must have been presented initially to the Commission within "a period of five years after August 13, 1946, and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by Congress." 60 Stat. 1052. Therefore, plaintiffs' water claims must be within the scope of their original petition or plaintiffs'

water claims will be permanently time-barred.

In order for plaintiffs' water asset claims to fall within the scope of its original petition, this court must first look to the petition itself. That petition need only contain a short and plain statement of plaintiffs' claim. The information provided in that statement, however, must provide enough information to supply the defendant with fair notice of what that claim entails and the grounds upon which that claim rests.[5] Determining whether a petition provides full notice requires the consideration of two contrasting mandates.

■ On the one hand, the general rules of modern pleading require a liberal reading of the petition. *See, e.g., Snoqualmie Tribe*, 178 Ct.Cl. at 588; 372 F.2d at 961; *Yankton Sioux Tribe v. United States*, 175 Ct.Cl. 564, 569 (1966). This policy of liberality is even greater with Indian claimants because the court must effectuate the remedial intent of the Indian Claims Commission Act. *Minnesota Chippewa*, 11 Cl.Ct. at 536 (citing *Lower Sioux Indian Community*, 207 Ct.Cl. at 502, 519 F.2d at 1383; *Otoe and Missouri Tribe v. United States*, 131 Ct.Cl. 593, 131 F.Supp. 265, *cert. denied*, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955)). Moreover, this court is not unmindful of the fact that the severed portion of plaintiffs' original petition, *i.e.*, the portion of the original petition that is presently before this court, was for a general accounting, and, as such, the claim had to be written in broad terms because defendant has all of the information concerning that claim in its possession. *See Lower Sioux Indian Community*, 207 Ct.Cl. at 506–08, 519 F.2d at 1384.

---

5. This notice requirement determining the timeliness of exceptions is interchangeable with the notice requirement for relating back amended complaints. *See Minnesota Chippewa Tribe Red Lake Band v. United States*, 768 F.2d 338, 340–41 (Fed.Cir.1985), *reconsid'n denied*, 11 Cl.Ct. 534, 536–37 (1987). Even though the doctrine of relation back requires that the amendment stem from the same conduct, transaction, or occurrence, *see generally* Fed.R.Civ.P. 15(c); Ind.Cl. Comm.R.Civ.P. 13C, these provisions generally have been construed essentially to be notice requirements. *See, e.g., United States v. Lower*

*Sioux Indian Community*, 207 Ct.Cl. 492, 502, 519 F.2d 1378, 1383 (1975); *Snoqualmie Tribe of Indians ex rel. Skykomish Tribe v. United States*, 178 Ct.Cl. 570, 588, 372 F.2d 951, 961 (1967); *cf. Fort Peck Indians of the Fort Peck Reservation, Montana v. United States*, 34 Ind.Cl.Comm. 24, 55 (1974) (citing *Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957), *rev'd and remanded*, 207 Ct.Cl. 1045, 529 F.2d 532 (1975); *Minnesota Chippewa Tribe Red Lake Band v. United States*, 35 Ind.Cl.Comm. 98 (1974).

On the other hand, fair notice cannot be so liberally construed so as to become a mere device for avoiding the five-year statute of limitations under 60 Stat. 1052. *Snoqualmie Tribe*, 178 Ct.Cl. at 585, 372 F.2d at 959 (quoting *Snoqualmie Tribe v. United States*, 15 Ind.Cl.Comm. 267, 274 n. 9 (1965)). The purpose of that statute of limitations was to ensure that "there ... [would] be a prompt and final settlement of all claims between the government and its Indian citizens, .... and bring them to a conclusion once and for all." *United States v. Dann*, 470 U.S. 39, 46, 105 S.Ct. 1058, 1062–63, 84 L.Ed.2d 28 (1985) (citing 92 Cong.Rec. 5312 (1946) (statement of Cong. Jackson). This court also realizes that "[t]here must be an end to the filing of exceptions to the existing accounting reports in these ... [Indian accounting] cases ...," *Navajo Tribe v. United States*, 224 Ct.Cl. 171, 180, 624 F.2d 981, 985 (1980), especially where "for the most part ... [these new exceptions] relate to new matters not raised before." *Id.* at 181 n. 10, 624 F.2d 985 n. 10.

■ Based upon a review of previous case law, it seems, as plaintiffs argue, that an accounting claim can include all allegations against the government which involve the government's fiduciary relationship toward Indian claimants. This fiduciary obligation is quite extensive. It includes the government's duty to account where the government has undertaken to permit a third party to use reservation land and to extract reservation minerals, *Blackfeet and Gros Ventre Tribe v. United States*, 32 Ind.Cl.Comm. 65, 81 (1973), and its duty to pay a fair price for lands taken. *See, e.g., Fort Peck Indians*, 34 Ind.Cl.Comm. at 59–61; *see Minnesota Chippewa Tribe v. United States*, 41 Ind.Cl.Comm. 102, 102–04 (1977).

It is clear that the government's fiduciary duty extends to reservations and to the reservations' resources. *United States v. Northern Paiute Nation*, 8 Cl.Ct. 470, 485 (1985); *Navajo Tribe v. United States*, 9 Cl.Ct. 227, 232 (1985). Therefore, it is quite possible, in light of the government's strong fiduciary duty in this area, that an accounting claim can give rise to a governmental duty to account for the government's protection, or lack thereof, of water rights held by an Indian reservation.

However, it is unnecessary for the court to reach that issue in this case. The essential inquiry here is not whether Indian accounting claims in general can contain reservation water rights claims. Rather, the essential inquiry is whether plaintiffs' original petition envisioned accounting claims for the preservation of water rights; this inquiry can only be resolved by a comparison of plaintiffs' original petition and of plaintiffs' exceptions themselves. *Minnesota Chippewa Tribe*, 11 Cl.Ct. at 534. The result of that comparison often will depend upon the facts and circumstances of each case. *See United States v. Northern Paiute Nation*, 183 Ct.Cl. 321, 328, 393 F.2d 786, 790 (1968) (quoting *Snoqualmie Tribe*, 178 Ct.Cl. at 587, 372 F.2d at 960).

Having reviewed both the general accounting claim contained in plaintiffs' original petition and plaintiffs' water claim exceptions, it is apparent to this court that plaintiffs' general accounting claim was directed only toward a single aspect of the government's fiduciary relationship with the Western Shoshones. The purpose of the accounting was for the Western Shoshones to determine the exact dispositions of funds held by the government on their behalf and to receive compensation for the government's alleged misuse of those funds. *See* Indian Claims Commission, Annual Report, 1975, Appendix 6. This accounting, in essence, was a prerequisite for the Western Shoshones to maintain their claim because the government was in full possession of all information concerning the disposition of the Western Shoshones' funds. *See Lower Sioux Indian Community*, 207 Ct.Cl. at 508, 519 F.2d at 1387.

The two trust accounts which have been the focus of this docket for the past twenty years are good examples of typical books of account and other records envisioned by plaintiffs' original accounting claim. The first trust account was payable to the Western Shoshones under the Treaty of Ruby Valley. This account initially includ-

ed a sum of $100,000.00 payable to the Indians over a period of twenty years. 18 Stat. 689. The IMPL trust account was payable to the Western Shoshones under an Act of Congress and included payments for all the products purchased by the government from various Indian reservations. 22 Stat. 582, 590, *supra.* Both trust accounts were managed by defendant on behalf of the Western Shoshones, and all of the records from both trust accounts were within defendant's exclusive possession.

Most importantly, the Western Shoshones' request for a general accounting was necessary in order for the Western Shoshones to maintain their claim against both trust accounts, for without that accounting, the Western Shoshones had no independent means of discovering the exact violations involving the funds derived therefrom. Accordingly, it was only until the GSA issued a general accounting report that the Western Shoshones could allege any such violation involving either account with any particularity. As required by Ind. Cl.Comm.R.Civ.P. 7(b). ("A petition shall state [its claims] with particularity.") It also was only at this point that the Western Shoshones could discover much of the property which they had come to own as a result of the government's purchases with trust account proceeds.

Plaintiffs' water asset claims, by contrast, did not stem from any specific misuse of a trust account. Instead, these claims arose from defendant's alleged failure to provide reservoirs for plaintiffs' reservations and from defendant's alleged failure to halt water diversions by white settlers. These exceptions did not relate to any item held exclusively by defendant. Plaintiffs admitted they obtained the information concerning these water asset claims from independent research. It also is hard to imagine how defendant was in exclusive possession of the information concerning the water asset claims where plaintiffs' members have lived on the reservations over the past 100 years.

In support of their position, plaintiffs also argue that their water asset claims should be considered by the court because their general accounting claims within their original petition referred to the Treaty of Ruby Valley. This treaty was the document which empowered the President of the United States to provide the Western Shoshones with reservations so that they could become herdsmen and agriculturalists. 18 Stat. 689. Although this court agrees that a reference in the petition to the treaty could be beneficial in providing notice in some circumstances, *see Snoqualmie Tribe,* 178 Ct.Cl. at 588, 372 F.2d at 961; *Prairie Band of the Pottawatomie Tribe,* 28 Ind.Cl.Comm. at 458, plaintiffs' use of the treaty tends to undermine rather than support their argument that notice was provided in this case. Plaintiffs' general accounting claims within the original petition do not refer to the Treaty of Ruby Valley in full. Those accounting claims contain only a reference to article 7 of the Treaty, and that article only concerns the $100,000.00 trust fund which has been the subject of much litigation between the parties in this docket. The only discussion of the Western Shoshones' reservation rights occurred in article 6 of the Treaty, and that article was not mentioned anywhere in plaintiffs' general accounting claims in the original petition.

This court also finds that plaintiffs' general accounting claims contained in their original petition lacks any specific reference to any Western Shoshones reservation, and fails to contain any reference to the Executive Orders which created the Western Shoshones reservation areas. *See Navajo Tribe v. United States,* 220 Ct.Cl. 172, 177, 597 F.2d 1367, 1370 (1979) (per curiam). Even plaintiffs' exceptions state that the information to support their water asset claims were obtained from newly-found information. Therefore, "it is difficult to understand how defendant could be clairvoyantly on notice of [these water asset claims]." *Id.* at 178, 597 F.2d at 1371.

In fact, the only possible notice of plaintiffs' water asset claims this court has been able to find within plaintiffs' original petition is the general catch-all provision requesting "such other and further relief as ... may appear just and proper." Such catch-all provisions are not enough to provide notice. *Id.; Minnesota Chippewa,* 11 Cl.Ct. at 540. *But cf. Lower Sioux Indian Community,* 207 Ct.Cl. at 506, 519 F.2d at

**82**

1386 (inclusion of title, "Claims Relating to Treaty of 1858 for General Accounting and Other Relief" was sufficient to include a taking claim where the substance of the pleadings was unquestionably more determinative of an understanding of the nature of the complaint than was the caption).

Finally, this court must take note of the fact that much of plaintiffs' arguments rely on their amended petition filed in 1967. While this amended petition is generally consistent with the accounting claims contained in the original petition, the amended petition also states that defendant had an overall fiduciary duty to the Western Shoshones and that the Western Shoshones required an area at least equivalent to their aboriginal land in order to maintain their manner of living. Nevertheless, whatever additional information was provided by the amended petition, this information is irrelevant to resolving the issue before this court. The essential inquiry in deciding whether an exception is within the scope of the *original* petition is based upon a comparison of these exceptions to the *original* petition. *Navajo Tribe*, 220 Ct.Cl. *passim; Minnesota Chippewa*, 11 Cl.Ct. at 537, and does not concern the facts presented by any possible amendment. Because plaintiffs' water asset claims are not within the scope of the original petition, their additional statements concerning a general fiduciary duty to account and the need for an equivalent area are irrelevant to the issue at hand.

CONCLUSION

In sum, plaintiffs' water asset claims do not fall within the scope of their original petition despite the standard of liberality accorded to Indian claims. If plaintiffs had any claims arising from the government's mishandling of their water rights, plaintiffs should have included those claims in their 1951 petition. Accordingly, this court orders that plaintiffs' water asset exceptions be dismissed.

IT IS SO ORDERED.