The **CATAWBA INDIAN TRIBE OF SOUTH CAROLINA**

v.

The **UNITED STATES.**

No. 90–553L.

United States Claims Court.

Aug. 20, 1991.

Don B. Miller, Boulder, Colo., Atty. of record, for plaintiff. Jay Bender, Robert M. Jones, Richard Steele, of counsel.

Andrew M. Eschen, Washington, D.C., with whom was Asst. Atty. Gen. Richard B. Stewart, for defendant.

## OPINION

YOCK, Judge.

Plaintiff, the Catawba Indian Tribe of South Carolina, seeks recovery for damages arising from the Government's breach of alleged fiduciary duties. This case is before the Court on defendant's motion to dismiss on the grounds that the Complaint is not within the jurisdiction of this Court. For the reasons stated herein, the defen-

dant's motion is granted, and the Complaint will be dismissed.

### Facts

In 1760 and 1763, Great Britain negotiated treaties with plaintiff, the Catawba Indian Tribe of South Carolina (Tribe). As a result of these treaties, a 144,000–acre tract of land was set aside as a reservation for the Tribe. Later, when the United States achieved independence from Great Britain, it became invested with all of the former sovereign's rights and obligations under the 1760 and 1763 treaties. In 1790, Congress enacted the Indian Trade and Intercourse Act (the Nonintercourse Act), presently codified at 25 U.S.C. § 177 (1988), that provides the Federal Government with the exclusive authority to sign treaties with the various Indian tribes, and thus prohibits the individual states from signing such treaties. To the extent that the states did sign treaties affecting Indian land titles with the various Indian tribes in violation of the Nonintercourse Act, the Supreme Court has stated that such a land conveyance without the sovereign's consent would be void *ab initio*. *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 245, 105 S.Ct. 1245, 1257, 84 L.Ed.2d 169 (1985).

On March 3, 1840, the State of South Carolina (State), without the consent or participation of the United States, entered into the Treaty of Nation Ford with the Tribe. As a result of this treaty, the Tribe ceded its interests in the 144,000–acre tract to the State, and the State in return promised to purchase for the Tribe another tract of land valued at $5,000, as well as to pay $16,000 over a nine-year period. However, the only land subsequently purchased for the Tribe by the State was a 630–acre parcel of land purchased in 1842 for $2,000. This is the only land actually occupied by the plaintiff Tribe today.

Over the next 100 years, the Tribe, with little success, communicated with various federal and State officials concerning its claim to the 1763 Treaty lands, which were ceded to the State of South Carolina in the Treaty of Nation Ford.[1] However, in 1943, the Tribe, the State and the Secretary of the Interior reached an agreement under which the Secretary of the Interior accepted legal title to some 3,434 acres of land to be held in trust for the Tribe. All of this land was within the boundaries of the 1763 Treaty reservation. In addition, this agreement did not require the Tribe to release its claim for the return of the remaining 140,000 some acres, although such a release had been proposed in a preliminary draft of the agreement. Thereafter, in 1944, the Secretary of the Interior approved the Catawba Tribe's constitution under the Indian Reorganization Act.[2]

In 1953, Congress declared that. as a matter of policy, the United States was to terminate the Federal Government's trust responsibilities toward Indian tribes,[3] and in 1958 the United States began an active effort to terminate federal supervision over the Catawba Tribe. During the next four years, Department of the Interior officials negotiated with tribal leaders to secure tribal consent to termination. Allegedly, during these negotiations, tribal officials were assured by a Bureau of Indian Affairs (BIA) official that tribal termination would not jeopardize the Tribe's land claim. The BIA drafted the termination legislation, and Congressman Hemphill of South Carolina, the sponsor of the legislation, told the Tribe that he would not introduce the bill without its approval. On March 28, 1959, the BIA draft of the bill was read line by line to the Tribe, which then approved the introduction of the legislation.

The Department of the Interior, in its testimony and reports to Congress on the termination bill, indicated that the Tribe

---

1. The Tribe was represented by legal counsel during at least part of this time. For example, in 1905, the Tribe's formal request for assistance that was directed to the Bureau of Indian Affairs was accompanied by a "lengthy legal brief * * * and set forth the legal basis of the claim, *i.e.*, that the Catawbas' lands were protected by federal law (the Nonintercourse Act)." Com-

plaint ¶ 16(h). The Commissioner of Indian Affairs denied the request.

2. Complaint ¶ 18.

3. H.R.Cong.Res. 108, 83d Cong., 1st Sess. (1953), 67 Stat. B132.

consented to the termination proposal. Apparently, however, the Department never notified Congress about the existence of the Tribe's land claim or that the Tribe's consent was allegedly conditioned upon protection of that claim. Nevertheless, on September 21, 1959, the Catawba Indian Tribe of South Carolina Assets Distribution Act, 73 Stat. 592, 25 U.S.C. §§ 931–938 (1959) (Catawba Act or 1959 Act) was enacted. The Catawba Act contained substantially the same line-for-line language that the Tribe had approved, although Congress amended the bill to provide that the Catawba Act could not take effect until a majority of adult members of the Tribe agreed to a division of tribal assets. Allegedly, in an attempt to persuade tribal members to vote for termination, Department of Interior officials told the Tribe that the 1959 Act would not jeopardize the land claim. The majority vote of the adult members of the Tribe was achieved on June 30, 1960, and the termination became effective two years later, on July 1, 1962. Pursuant to the 1959 Act, the 3,434–acre reservation that was the subject of the 1943 agreement between the Tribe, the State of South Carolina, and the Secretary of the Interior, was distributed to the members of the Tribe.

In the mid–1970's, the Tribe retained legal counsel to pursue its land claim to the remaining 140,000 some acres, and petitioned the Department of the Interior to initiate legal action on its behalf to secure the return of that land. The Solicitor of the Department of the Interior was initially favorably disposed towards plaintiff's petition, concluding in 1977 both that the rebuffs given the Tribe in the early 1900's were legally unjustified, and that the 1959 Act did not affect pre-existing rights. Accordingly, he requested that the Department of Justice institute legal action on behalf of the Tribe. However, this request was later withdrawn and the Tribe's petition to the Department of the Interior was eventually denied in 1978 or 1979.

In 1980, plaintiff filed suit in its own name in the Federal District Court of South Carolina, seeking trespass damages and recovery of the land at issue which was the subject of the 1840 Treaty with the State. The District Court granted summary judgment in favor of the State, and ruled that the 1959 Act resulted in the application of the South Carolina ten-year statute of limitations to the Tribe's claim. On appeal, a panel of the Court of Appeals for the Fourth Circuit reversed. *Catawba Indian Tribe v. South Carolina,* 718 F.2d 1291 (4th Cir.1983), and that opinion was later adopted by the full Court of Appeals for the Fourth Circuit. *Catawba Indian Tribe v. South Carolina,* 740 F.2d 305 (4th Cir. 1984). Eventually, the suit reached the Supreme Court,[4] which reversed the Court of Appeals and held that the 1959 Act resulted in the application of the South Carolina statute of limitations to the Tribe's land claim.[5] It thereafter remanded the case to the Court of Appeals for the Fourth Circuit to review the District Court's interpretation of the applicable South Carolina statute of limitations. *South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 511, 106 S.Ct. 2039, 2047, 90 L.Ed.2d 490 (1986) (*Catawba*).

On remand, the Court of Appeals held that the applicable South Carolina statute of limitations would bar the Tribe's claim to any lands that had been adversely possessed for ten continuous years during the period between the effective date of the

---

**4.** After *certiorari* was granted, the United States, upon the request of the Supreme Court, filed an *amicus* brief in which it indicated that the 1959 Act made the State's statute of limitations applicable to plaintiff's claim.

**5.** The relevant section of the Catawba Act provides: "The constitution of the tribe adopted pursuant to the Act of June 18, 1934 (48 Stat. 984), as amended [25 U.S.C. 461 et seq.], shall be revoked by the Secretary. Thereafter, the tribe and its members shall not be entitled to any of

the special services performed by the United States for Indians because of their status as Indians, all statutes of the United States that affect Indians because of their status as Indians shall be inapplicable to them, *and the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction.* Nothing in this subchapter, however, shall affect the status of such persons as citizens of the United States." 25 U.S.C. § 935 (1988) (emphasis added).

Catawba Act (in 1962), and the date the Tribe filed its land claim (in 1980), and remanded the case to the District Court for further proceedings. *Catawba Indian Tribe v. South Carolina,* 865 F.2d 1444 (4th Cir.), *cert. denied,* 491 U.S. 906, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989). On remand, the District Court, on July 19, 1990, dismissed the Tribe's claim to approximately 75 percent of the land. The Tribe's claim to the remaining 25 percent of the land is still the subject of active litigation in the Federal District Court of South Carolina.

On June 21, 1990, the Tribe filed this action declaring that the Tribe has now permanently lost approximately 75 percent of its original 1840 land claim. The main thrust of plaintiff's Complaint is that the Government has breached its fiduciary duties to protect the Tribe's 1840 land claim (Complaint, Claims 1 through 3), and to protect it from the effects of the 1959 Act (Complaint, Claims 4 and 7).[6] As earlier indicated, the defendant has now moved to dismiss the Complaint for lack of subject matter jurisdiction pursuant to USCC Rule 12(b).

### Discussion

The Government's motion to dismiss for lack of jurisdiction is premised on two statute of limitations arguments.[7] The first and primary argument is that the plaintiff's claims (all seven claims contained in its Complaint) are time barred and thus outside of this Court's jurisdiction based on 25 U.S.C. § 70k (1976). This is true, asserts the Government, because all of the plaintiff's claims are based on a historical claim for Indian land, which accrued long before 1946 and which was not timely presented to the Indian Claims Commission prior to the expiration period of the applica-

ble statute (August 12, 1951), 25 U.S.C. § 70k. The Government's second argument, in the alternative, is based on this Court's own six-year statute of limitations set forth in 28 U.S.C. § 2501 (1988). Here, the Government asserts that, at the latest, all of the plaintiff's claims accrued in 1962 when the Catawba Act went into effect and which terminated any federal responsibility for the Tribe and its individual members. Thus, the plaintiff's claims had to have been presented to this Court before 1968 in order for this Court to have and assert jurisdiction.

### I.

As indicated above, the Government's primary argument is that this Court lacks subject matter jurisdiction over this dispute, since the Indian Claims Commission was the exclusive forum for historic claims (*i.e.,* for wrongs accruing before 1946) asserted against the United States. Defendant contends that all of the plaintiff's claims are based upon the Government's refusal to assist it in obtaining a remedy for its execution in 1840 of the Treaty of Nation Ford with the State of South Carolina. Accordingly, defendant submits that the wrong accrued long before 1946, and that the Tribe was aware that it had a claim against the Government long before 1946. The Government thus concludes that since the plaintiff failed to present its claims to the Indian Claims Commission within five years of August 13, 1946, the claims are now time barred by 25 U.S.C. § 70k.

In its responsive briefing before this Court, the plaintiff agrees that the pre-1946 claims asserted by the Tribe in Claims 1 and 2 of the Complaint are barred by the Indian Claims Commission Act's statute of

---

**6.** Plaintiff also alleges that the defendant breached an implied contract to protect the land claim from the effects of the 1959 Act (Claim 5), that defendant's failure to protect the land claim constitutes a taking of the Tribe's vested property rights in violation of the Fifth Amendment (Claim 6), and that the Government has a continuing duty to quiet title to the land of the 1763 Treaty in the Tribe and distribute such among the members of the Tribe (Claim 7).

**7.** Defendant also argues that the Complaint fails to state a claim upon which relief can be granted, since the decision by the United States whether or not to litigate on behalf of a Tribe is wholly discretionary, rather than a mandatory duty. However, the Court does not have to reach this issue since the defendant's other arguments dispose of this case.

limitations, but submits that all the other claims contained in its Complaint (*i.e.* Claims 3 through 7) should not be dismissed. Plaintiff emphasizes that its primary claim arises out of Government nonfeasance during the period from 1958 to 1962, which is when the defendant negotiated with tribal officials to terminate the trust relationship with the Tribe.

Unfortunately for the plaintiff, however, the Government is correct in its legal assertions.

Section 12 of the Indian Claims Commission Act (ICCA), 25 U.S.C. § 70k (1976), provided an *exclusive* remedy against the United States for Indian tribes' claims first accruing before August 13, 1946. The Indian Claims Commission was established in 1946 to provide a monetary damages remedy against the United States for wrongs allegedly committed by the United States in its dealings with the Indian tribes. Such claims had to be presented to the Indian Claims Commission within five years of August 13, 1946, and could not otherwise be submitted to any court, administrative agency, or Congress.

> The Commission shall receive claims for a period of five years after August 13, 1946, and no claim *existing* before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress.

25 U.S.C. § 70k (1976) (emphasis added). Claims not adjudicated by the Commission were transferred to the United States Court of Claims. Pub.L. No. 94–465, Act of October 8, 1976, 90 Stat. 1990. This Court subsequently inherited the Court of Claims ICCA jurisdiction. Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, Apr. 2, 1982, 96 Stat. 25, 46.

The ICCA's purpose, explicit provisions, and legislative construction clearly demonstrate that the "chief purpose of the [ICCA was] to dispose of the Indian Claims problem with finality." *United States v. Dann*, 470 U.S. 39, 45, 105 S.Ct. 1058, 1062, 84 L.Ed.2d 28 (1985) (quoting H.R.Rep. No.

1466, 79th Cong., 1st Sess. 10 (1945)). As noted recently by this Court,

> [t]he purpose of that statute of limitations was to ensure that "there ... [would] be a prompt and final settlement of all claims between the government and its Indian citizens, ... and bring them to a conclusion once and for all."

*Te–Moak Bands of Western Shoshone Indians v. United States*, 18 Cl.Ct. 74, 80 (1989), quoting *United States v. Dann, supra*, 470 U.S. at 46, 105 S.Ct. at 1062. The legislative history of the ICCA reflects the intention of Congress that the Act:

> would require all pending Indians claims of whatever nature, contractual and noncontractual, legal and nonlegal, to be submitted to this fact-finding body within 5 years, and would outlaw claims not so submitted.

H.R.Rep. No. 1466, 1946 U.S.Code Cong.Service, 1347, 1349. *See also Navajo Tribe v. State of New Mexico*, 809 F.2d 1455 (10th Cir.1987). In that case, the Navajo Nation argued that the Indian Claims Commission did not have jurisdiction over claims to land. The Court disagreed, stating:

> The language [in the ICAA, § 2] is sweeping, including even claims "based upon fair and honorable dealings" which did not otherwise constitute recognized actions at law or equity. As the legislative history indicates, Congress did not enumerate the cognizable claims under the new Act to narrowly circumscribe the Commission's jurisdiction. Rather, Congress desired to finally provide a forum for the resolution of all possible accrued claims.
>
> Congress wished to settle all meritorious claims of long standing of Indian Tribes and bands whether those claims were of a legal or equitable nature which would have been cognizable by a court of the United States had the United States been subject to suit and the Indians able to sue, or whether those claims were of a purely moral nature *not* cognizable in courts of the United States under any existing rules of law or equity.

*Otoe & Missouria Tribe of Indians v. United States,* 131 Ct.Cl. 593, 131 F.Supp. 265, 275 (1955) (emphasis in original).

*Id.* at 1465.

The gravamen of the seven claims alleged in the Complaint is plaintiff's belief that the Tribe was wronged due to the Government's refusal to assist it in obtaining a remedy for its execution in 1840 of the Treaty of Nation Ford with the State of South Carolina. By plaintiff's own admission, the Tribe was aware that any claim it may have had against the United States for its refusal to assist the Tribe in obtaining its aboriginal land, ceded by the 1840 Treaty of Nation Ford, had accrued long before 1946, the effective date of the ICCA. The Tribe was thus on notice that any claim not properly presented to the Indian Claims Commission could not "thereafter be submitted to any court or administrative agency * * * nor * * * entertained by the Congress." ICCA, § 12, 25 U.S.C. § 70k. Accordingly, the Government is correct and all of the plaintiff's claims must be dismissed.

## II.

■ The Government has also argued in the alternative that even if the Court does not find that the plaintiff's claims are time barred by the ICCA statute of limitations, it should find that all of the claims are barred by this Court's own six-year statute of limitations set forth in 28 U.S.C. § 2501 (1988).[8] With respect to plaintiff's Claims 1 through 3, the defendant submits the operative underlying event was the Tribe's 1840 Treaty with the State of South Carolina, and that plaintiff was long aware both of its potential land claim against the State, and the fact that the United States would not act on the claim. With respect to Claims 4 through 7, regarding the Government's alleged failure to protect the Tribe from the effects of the 1959 Act, the defendant argues that since the trust relationship with the United States terminated under the 1959 Act on July 1, 1962, any claim for a breach of trust could not accrue after the relationship was legally terminated. Even if the Government had the fiduciary duties alleged by plaintiff (*e.g.,* to warn of the applicable statute of limitations period), judicial recourse for such a breach was required no later than 1968.

The essence of plaintiff's argument in opposition is that the claim could not have accrued until damage was suffered, and that it was not until 1986, when the Supreme Court ruled in *Catawba* that the land claim was affected by the 1959 Act, that the Tribe could determine its rights and finally determine whether or not it had suffered damage. *See Fort Mojave Indian Tribe v. United States,* 23 Cl.Ct. 417, 428–31 (1991) Alternatively, plaintiff contends that even if the claim did accrue in 1962, the running of the six-year statute of limitations is tolled by the concealment and misrepresentation of the United States.

Unfortunately for the plaintiff Tribe, the Court must again agree with the Government. Even if the ICCA statute of limitations did not preclude the assertion of the plaintiff's claims in this Court, they would all be precluded by this Court's own six-year statute of limitations. All of the plaintiff's claims in its Complaint accrued prior to the Supreme Court's 1986 decision date. Not only was plaintiff's basic land claim *not* inherently unknowable, but plaintiff was well aware that it was ripe nearly 100 years ago, when it asked for the Department of Interior's assistance in obtaining either compensation or a return of the land in the early 1900's.[9] With respect to the effect of the 1959 Act, as noted by the Supreme Court, the express provision of 25 U.S.C. § 935 stating that South Carolina laws "shall apply to [the Tribe] in the same manner they apply to other persons or citizens within the[ ] jurisdiction," established in "unmistakably clear language" that the State's statute of limitations applied to the

---

**8.** 28 U.S.C. § 2501 states in pertinent part:

"Every claim of which the United States Claims Court has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."

**9.** *See supra* note 1.

Tribe. *Catawba,* 476 U.S. at 505–06, 106 S.Ct. at 2043–44.

■ As the Supreme Court noted, [w]e do not accept petitioners' argument that the Catawba Act immediately extinguished any claim that the Tribe had before the statute became effective. Rather, we assume that the status of the claim remained exactly the same immediately before and immediately after the effective date of the Act, but that the Tribe thereafter had an obligation to proceed to assert its claim in a timely manner as would any other person or citizen within the State's jurisdiction.

*Id.* at 510, 106 S.Ct. at 2046. Thus, the Catawba Act did not *destroy* plaintiff's claim, it merely put the burden on the plaintiff Tribe to pursue its claim within the State's statute of limitations.[10]

■ The Government's repeated refusal to pursue the claim on the Tribe's behalf dating back from the early 1900's, coupled with the clear language of the 1959 Act, show that the plaintiff was on notice of the existence and basis of the claim. Thus, the facts underlying the claim were neither concealed nor inherently unknowable, and the statute of limitations was not tolled.[11] *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988); *Japanese War Notes Claimants Ass'n v. United States,* 178 Ct.Cl. 630, 634, 373 F.2d 356, 359, *cert. denied,* 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967), *reh'g denied,* 390 U.S. 975, 88 S.Ct. 1020, 19

L.Ed.2d 1192 (1968). Furthermore, this case can be distinguished from *Fort Mojave Indian Tribe v. United States,* 23 Cl.Ct. 417 (1991), which the plaintiff relies upon, since, unlike that case, there was no previous litigation by this plaintiff that resulted in a Supreme Court decree that specifically authorized the Government to seek reconsideration. Since there was no such previous decree for this plaintiff, there was no "potentially viable method for the government to further its trust responsibilities and correct its acknowledged error." *Id.* at 430. Accordingly, the claims accrued by the operation of the 1959 Act (*i.e.,* by 1962), long before the Supreme Court's decision in *Catawba.*

■ The presence of a fiduciary relationship does not toll the statute of limitations under the facts of this case. While plaintiff has repeatedly alleged Government nonfeasance, nonfeasance by a trustee, as distinguished from repudiation of the trust by the trustee, does not present an exception to tolling. *Hopland Band,* 855 F.2d at 1578; *Cherokee Nation of Oklahoma v. United States,* 21 Cl.Ct. 565, 571 (1990); *Jones v. United States,* 9 Cl.Ct. 292, 295 (1985), *aff'd,* 801 F.2d 1334 (Fed. Cir.1986), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987). The present facts present a strong case for not tolling the statute of limitations, since the fiduciary relationship was not even arguably ongoing, as the 1959 Act expressly *terminated* the guardianship.[12] *Cf. Fort*

---

**10.** Defendant notes that the Catawba Act was passed by the entire Congress. Defendant is correct in stating that plenary power with respect to all Indian affairs rests with Congress. *Lone Wolf v. Hitchcock,* 187 U.S. 553, 565, 23 S.Ct. 216, 221, 47 L.Ed. 299 (1903). Nevertheless, this power is not absolute. *United States v. Alcea Bank of Tillamooks,* 329 U.S. 40, 54, 67 S.Ct. 167, 174, 91 L.Ed. 29 (1946); *see also United States v. Creek Nation,* 295 U.S. 103, 109–110, 55 S.Ct. 681, 684, 79 L.Ed. 1331 (1935). For example, plenary authority "does not extend so far as to enable the Government 'to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation * * *.'" *Shoshone Tribe v. United States,* 299 U.S. 476, 497, 57 S.Ct. 244, 252, 81 L.Ed. 360 (1937) (quoting *Creek Nation,* 295 U.S. at 110, 55 S.Ct. at 684).

In the case at bar, Congress' passage of the Catawba Act did not mean either that plaintiff's land was given to others, or that plaintiff's claim was eliminated. The passage of the Catawba Act only meant that it was up to plaintiff to take timely legal action on its claim.

**11.** Furthermore, the Supreme Court indicated "we perceive no contradiction between the applicability of the state statute of limitations and the assurance that the status of any state claims would not be affected by the Act." *Catawba,* 476 U.S. at 510, 106 S.Ct. at 2046.

**12.** The general relationship between defendant and Indian tribes has often been characterized as that of a guardian to a ward, rather than as a trustee to a beneficiary. *United States v. Mitchell,* 463 U.S. 206, 234 n. 8, 103 S.Ct. 2961, 2978 n. 8, 77 L.Ed.2d 580 (1983). This type of relation-

*Mojave Indian Tribe v. United States*, 23 Cl.Ct. 417 (1991) (previous Supreme Court decree created mechanism by which the Government could resecure rights for plaintiffs, hence the trust relationship was ongoing).

 While plaintiff argues it was not represented by counsel during the termination negotiations in 1958–59, apparently it was sophisticated enough to have legal counsel advising it on its land claims at least several times in the past. In *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 721 (Fed.Cir.), *cert. denied*, 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984), the Federal Circuit found that the running of the statute of limitations would not be tolled when "the Indians were capable enough to seek advice, launch an inquiry, and discover through their agents the facts underlying their current claim." The court emphasized that the six-year statute of limitations, set forth in 28 U.S.C. § 2501, is not tolled by the Indians' ignorance of their legal rights. *Menominee*, 726 F.2d at 720–21. Plaintiff presents a similar situation here, with a similar result.

Accordingly, the claims accrued well over six years ago, and certainly no later than 1962, and the presence of a fiduciary relationship, even if it were ongoing (which it was not), does not serve to toll the statute of limitations. Since the facts alleged in the Complaint reveal no possible basis on which the plaintiff can prevail, the defendant's motion to dismiss for lack of subject matter jurisdiction under USCC Rule 12(b)(1) is granted. *W.R. Cooper Gen. Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed.Cir.1988).

## CONCLUSION

Defendant's motion to dismiss under USCC Rule 12(b)(1) is granted as the instant claims are barred by the statute of limitations discussed herein. The Complaint is to be dismissed for lack of subject

matter jurisdiction, and judgment shall issue accordingly.

Each party is to bear its own costs.

---

ship implies that at some point the ward will begin to take responsibility for handling its own affairs. *See e.g. Cherokee Nation*, 21 Cl.Ct. 565,

573 (1990). Certainly, terminating a guardianship is an indication that the ward is expected to take responsibility for handling its own affairs.