**FORT MOJAVE INDIAN TRIBE, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 169–89L, 170–89L.**

United States Court of Federal Claims.

July 1, 1993.

Daniel H. Israel, Boulder, CO, for plaintiffs.

R. Anthony Rogers, with whom were Acting Asst. Atty. Gen. Myles E. Flint and Marc A. Smith, Washington, DC, for defendant; William Swan, Office of the Field Sol., of counsel.

*OPINION*

ANDEWELT, Judge.

In a July 1, 1991, opinion, this court denied in part defendant's motion for summary judgment and concluded that plaintiffs' claim herein was not barred by the six-year statute of limitations set forth in 28 U.S.C. § 2501. *Fort Mojave Indian Tribe v. United States*, 23 Cl.Ct. 417, 428–31 (1991) (*Fort Mojave I*). Defendant now seeks to renew its previously rejected motion for summary judgment on the basis of the Court of Appeals for the Federal Circuit's recent application of the statute of limitations in *Catawba Indian Tribe v. United States*, 982 F.2d 1564 (Fed.Cir. 1993), *cert. denied,* — U.S. —, 113 S.Ct. 2995, 125 L.Ed.2d 689 (1993) (*Catawba*).

I.

The background facts of *Catawba* are as follows. In 1959, Congress enacted the Catawba Indian Tribe Division of Assets Act, 25 U.S.C. §§ 931–938 (the Termination Act), which became effective in 1962. The Termination Act modified the Catawba Tribe's relationship with both state and federal governments. With respect to the states, the Termination Action provided that "the laws of the several States shall apply to [the Catawba Tribe] in the same manner they apply to other persons or citizens within their jurisdiction." With respect to the federal government, the Termination Act, in effect, provided for termination of the federal government's trust relationship with the Catawba Tribe.[1]

---

1. In the lower court decision reviewed by the Federal Circuit in *Catawba,* the Claims Court stated that "the fiduciary relationship [between the federal government and the Catawba Tribe] was not even arguably ongoing, as the [Termination] Act expressly *terminated* the guardianship." *Catawba Indian Tribe v. United States,* 24 Cl.Ct. 24, 31 (1991) (emphasis in original). On appeal, the *Catawba* court noted that the Termination Act may have created in place of this guardianship a short-term trust obligation to distribute all tribal assets held in trust by the federal government. But the court further explained that this obligation would have termi-

According to the Catawba Tribe, both before and after enactment of the Termination Act, officials of the Department of the Interior (DOI) assured the Catawba Tribe that the Termination Act would not affect the Catawba Tribe's previously expressed claim that the state of South Carolina had unlawfully appropriated approximately 144,000 acres of the Catawba Tribe's ancestral land. However, DOI's assurances ultimately proved wrong. In *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986) (*South Carolina*), the Supreme Court concluded that the Termination Act unambiguously made the Catawba Tribe subject to South Carolina laws covering adverse possession of land. On remand, the Court of Appeals for the Fourth Circuit concluded that, pursuant to these state laws, the Catawba Tribe lost title to any ancestral land that had been held in open and notorious possession by another for ten continuous years after the Termination Act became effective in 1962. *Catawba Indian Tribe v. United States*, 865 F.2d 1444 (4th Cir.1989), *cert. denied*, 491 U.S. 906, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989).

In 1990, the Catawba Tribe filed suit in the United States Claims Court seeking redress for the loss of its claim to ancestral land. The Catawba Tribe alleged therein that the government committed a breach of trust when it erroneously assured the Catawba Tribe that the Termination Act would not affect the Catawba Tribe's claim. The Claims Court never reached the merits of the claim but instead held that the breach action was barred by the statute of limitations. *Catawba Indian Tribe of South Carolina v. United States*, 24 Cl.Ct. 24 (1991). On appeal, the Catawba Tribe argued, *inter alia*, that it had not been damaged, and hence the statute of limitations could not have commenced to run, until 1986 when the Supreme Court in *South Carolina* interpreted the Termination Act to make the Catawba Tribe subject to South Carolina's laws covering adverse possession of land. The Federal Circuit rejected this argument as follows:

> The difficulty with the [Catawba] Tribe's argument, creative though it is, is that it is contrary to one of the fundamental premises of our legal system. The argument assumes that the adverse effect of the [Termination] Act did not become operative against the [Catawba] Tribe—the [Catawba] Tribe was not "damaged"—until the Supreme Court some 25 years later so construed the [Termination] Act. While the Supreme Court's pronouncement in 1986 might be relevant to fixing the time when the [Catawba] Tribe *subjectively* first knew what the [Termination] Act meant, it is fundamental jurisprudence that the Act's *objective* meaning and effect were fixed when the [Termination] Act was adopted [in 1962]. Any later judicial pronouncements simply explain, but do not create, the operative effect.

*Catawba*, 982 F.2d at 1570 (emphasis in original). In renewing its previously rejected summary judgment motion, defendant contends that this same reasoning demands the conclusion that the instant action similarly is barred by the statute of limitations.

## II.

To understand defendant's contention, it is necessary to review some of the background facts of the instant case. As explained in detail in *Fort Mojave I*, 23 Cl.Ct. 417, the Supreme Court, in *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963) (*Arizona I*), initially held that plaintiffs herein, the Fort Mojave Indian Tribe and the Colorado River Indian Tribe, were annually entitled to use a certain amount of water from the Colorado River. Specifically, plaintiffs were given water rights sufficient to permit the irrigation of all land that was classified as "practicably irrigable" on their respective reservations. *Id.* at 600, 83 S.Ct. at 1498. The court's decision in *Arizona I* was "carr[ied] into effect" by a 1964 decree, *Arizona v. California*, 376 U.S. 340, 84 S.Ct. 755, 11

nated by July 1, 1964. *Catawba*, 982 F.2d at 1572-73.

L.Ed.2d 757 (1964) (the 1964 decree), which defined, *inter alia,* plaintiffs' water allotments based upon calculations of the "practicably irrigable land" on their reservations.[2] Years later, pursuant to Article IX of the 1964 decree, the United States and plaintiffs petitioned the Supreme Court to increase plaintiffs' water allotments on the ground that the 1964 decree was based on an erroneous assessment of the practicably irrigable land on the reservations. The Supreme Court appointed a special master to evaluate the petition and the special master ultimately agreed that a modification was appropriate. However, in *Arizona v. California,* 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (*Arizona II*), the Supreme Court rejected the special master's recommended modification and declined to alter the 1964 decree with respect to the amount of practicably irrigable acreage on plaintiffs' respective reservations.

In renewing its motion for summary judgment, defendant analogizes the instant case to *Catawba.* Defendant likens the 1964 decree to the Termination Act in *Catawba,* and the Supreme Court decision in *Arizona II* denying modification of the 1964 decree to the Supreme Court decision in *South Carolina* interpreting the Termination Act. Defendant argues that like the Termination Act, which objectively set forth and fixed the Catawba Tribe's rights with respect to their land, the 1964 decree objectively set forth and fixed plaintiffs' water rights. Defendant further argues that like *South Carolina,* which affected only the Catawba Tribe's subjective understanding of its rights and not its objective rights, *Arizona II* affected only plaintiffs' subjective understanding of their water rights and not their objective rights. Defendant interprets *Catawba* to stand for the proposition that the statute of limitations commences to run when objective rights are fixed, and therefore argues that the statute of limitations in the instant case commenced to run with the 1964 decree

rather than with the Supreme Court's decision in *Arizona II.*

### III.

Defendant's analogies between the instant case and *Catawba,* and defendant's legal arguments based upon those analogies, are flawed. First, the 1964 decree is not analogous to the Termination Act. The Termination Act was an act of Congress while the 1964 decree is a Supreme Court decree carrying into effect a Supreme Court decision in a litigated case. As a federal statute, when the Termination Act was adopted, it established the present and future rights of the Catawba Tribe and according to the Federal Circuit, it did so in an unambiguous manner, without any pertinent exceptions. The 1964 decree did not secure and fix plaintiffs' water rights in an analogous way. Indeed, Article IX of the 1964 decree indicates that the Supreme Court specifically intended that the decree not be final. Article IX expressly creates an avenue for any party to seek modification of the decree's initial terms simply by making such a request to the Supreme Court. Article IX provides:

> Any of the parties may apply at the foot of this decree for its amendment or for further relief. The Court retains jurisdiction of this suit for the purpose of any order, direction, or modification of the decree, or any supplementary decree, that may at any time be deemed proper in relation to the subject matter in controversy.

376 U.S. at 353, 84 S.Ct. at 762. Thus, while the Termination Act fixed the Catawba Tribe's land rights as subject to South Carolina law, Article IX of the 1964 decree specifically left open the Supreme Court's possible reconsideration and modification of the water allocation.

This distinction carries through to *South Carolina* and *Arizona II.* In *South Carolina,* the Supreme Court did no more than

---

**2.** The calculations of the "practicably irrigable acreage" upon which the Supreme Court relied in both *Arizona I* and the 1964 decree stem from a 433–page report submitted to the Court by a special master appointed to take evidence, make findings of fact, state conclusions of law, and recommend a decree clarifying the parties' water rights with respect to the Colorado River and its tributaries.

interpret the provisions of the Termination Act, which previously established and fixed the Catawba Tribe's land rights. In *Arizona II*, however, the Supreme Court considered the merits of a petition filed pursuant to Article IX of the 1964 decree, and determined the extent to which the Court would change its previous water allocation. Thus, in *Arizona II*, the Supreme Court did not merely interpret its previous decision, but instead made an independent assessment of whether plaintiffs' water rights should be modified. Ultimately, the Supreme Court determined not to modify the pertinent water entitlements set forth in the 1964 decree. But in so doing, the Court did not suggest that Article IX was an inappropriate or improper route for seeking modification, *i.e.*, that a modification had not been potentially available thereunder.[3] Rather, after reviewing the special master's decision and the parties' arguments, the Court likened reopening the issue of "irrigable acreage" to a "Pandora's Box" and concluded that such an action would be "counter to the interests of all parties" and would overturn the delicate balance achieved by the 1964 decree. *Arizona II*, 460 U.S. at 625, 103 S.Ct. at 1394. In effect, the Supreme Court reconsidered its original water allocation as it indicated it would in Article IX of the 1964 decree, but ultimately concluded that the change desired by the parties was inappropriate.

In summary, the Federal Circuit in *Catawba* applied the long-recognized standard that "a claim does not accrue until *all* events necessary to fix the liability of the defendant have occurred." *Catawba*, 982 F.2d at 1570 (emphasis added). In the instant action, defendant engaged in a continuous series of trust actions aimed at securing plaintiffs' water rights and avoiding any possible damage to plaintiffs' interests. These actions commenced long before and extended well beyond the decision in *Arizona I* and the 1964 decree. During this entire period, defendant neither abandoned its fiduciary duties nor ceased acting in the capacity of trustee of plaintiffs' interests, and in view of Article IX of the 1964 decree, plaintiffs' water allocation was not "fixed" until the Supreme Court rejected the government's effort and refused to modify the 1964 decree in *Arizona II*.[4] To paraphrase the above-quoted portion of *Catawba* upon which defendant relies, the 1964 decree's effect was not "fixed" when the decree was issued but required later judicial announcements to determine its operative effect. Hence, until *Arizona II*, all of the events "necessary to fix the liability of defendant" had not yet occurred.

### Conclusion

For the reasons set forth above, defendant's renewed motion for summary judgment is denied. The parties shall follow the pretrial schedule set forth in this court's February 12, 1993, order.

IT IS SO ORDERED.

---

**3.** The Supreme Court stated: "We agree with the United States and the Tribes that this provision grants us power to correct certain errors, to determine reserved questions, and, if necessary, to make modifications in the decree." *Arizona II*, 460 U.S. at 618, 103 S.Ct. at 1391.

**4.** *Catawba* presents a very different scenario. The Termination Act, in pertinent part, ended

the trust relationship between the federal government and the Catawba Tribe. (*See* n. 1, *supra*.) Moreover, in 1978 the federal government specifically declined to initiate legal action on behalf of the Catawba Tribe with respect to its ancestral land claims. *Catawba Indian Tribe v. United States*, 24 Cl.Ct. at 27.